KAUFMAN v. FYE.

(*Jackson*. June 3, 1897.)

1. VERDICT. *Of three thousand dollars for breach of marriage contract sustained.*

   The facts set out in the opinion are held sufficient to support a verdict of $3,000 for breach of marriage contract. (*Post, pp. 145–165.*)

2. BREACH OF PROMISE. *Defendant's unlawful purpose may aggravate damages.*

   The jury may properly consider, in aggravation of damages in an action for breach of a marriage contract, that defendant induced plaintiff to visit him for the purpose of obtaining an opportunity to debauch her, and thereafter entered into a marriage contract for the same purpose, with the intention to violate such contract, although he was unsuccessful in his purpose. (*Post, pp. 165–168.*)

   Cases cited: Goodall v. Thurman, 1 Head, 216; Williams v. Hollingsworth, 6 Bax., 12; 33 Minn., 231; 15 Oregon, 277; 3 Ohio Cir. Ct., 305; 42 N. Y., 474; 1 N. J. Law, 77; 24 N. Y., 252.

3. SAME. *Unsuccessful plea of unchastity aggravates damages.*

   A plea in an action for breach of marriage contract, setting up the unchaste conduct and want of virtue of plaintiff as a defense, though made without bad faith, may, where there is a complete failure to prove the charge, be considered by the jury in aggravation of damages. (*Post, pp. 168–171.*)

   Cases cited: Ferguson v. Moore, 98 Tenn., 342; Williams v. Norwood, 2 Yer., 329; Wilson v. Nations, 5 Yer., 211; Braden v. Walker, 8 Hum., 34; Shirley v. Keathy, 4 Cold., 29; 30 N. Y., 285; 27 Mo., 600; 42 N. Y., 474.

Kaufman *v.* Fye.

4. CHARGE OF COURT. *Refusal of requests.*

The Court's refusal to give requests which are substantially covered by the principal charge is not error. (*Post, p. 171.*)

FROM TIPTON.

Appeal in error from Circuit Court of Tipton County. THOS. J. FLIPPIN, J.

TURLEY & WRIGHT, STEPHENSON & TIPTON, and J. C. BOALES for Kaufman.

GEORGE W. MURPHY and C. B. SIMONTON for Fye.

McALISTER, J. The defendant in error, Miss Birdie D. Fye, recovered a verdict and judgment in the Circuit Court of Tipton County against the plaintiff in error, W. P. Kaufman, for the sum of $3,000 damages for breach of a marriage contract. Kaufman appealed, and has assigned errors. The first assignment of error is that there is no evidence to support the verdict. The consideration of this assignment invites an investigation of the facts presented in this remarkable record. The declaration alleges that on or about April 1, 1895, she and defendant entered into a marriage contract, by the terms of which the defendant agreed and promised to marry the plaintiff within a reasonable time; that plaintiff, confiding in the promises of said defendant, has

Kaufman *v.* Fye.

always since remained, and is now, ready and willing to marry the defendant; that said defendant, although a reasonable time had elapsed, on the sixteenth day of February, 1896, and before the bringing of this suit, refused to marry the plaintiff, and declared he would never marry her, and still refuses to do so.

The defendant pleaded the general issue, and denied that he promised, in April, 1895, or at any time, to marry the plaintiff within a reasonable time or definite time fixed, and after such time elapsed refused to do so. Defendant, by leave of the Court, filed an additional plea, in which he averred that even if he did promise to marry the plaintiff within a reasonable time, he did so upon the plaintiff's representation that she was a chaste and virtuous woman, and that before he refused to marry her he found that all her reputed representations of chastity and virtue were untrue, and made for the fraudulent purpose of inducing him to marry her. And defendant further avers that plaintiff was guilty of lewd and unchaste conduct with one L. O. Knox, both before and after their said engagement, whereof defendant was ignorant till during the month of January, 1896; that upon being informed of such unchaste and lewd conduct, he broke off said engagement of marriage, and all this he is ready to verify.

Without pausing to comment upon the inconsistency of these several pleas, which, it must be admitted, is very glaring, we proceed to an examination of the testimony.

The defendant in error was born in Germany in 1873, and, when nine or ten years of age, removed with her parents to Cincinnati, Ohio. When fifteen years of age, she lost her mother, and, in the course of twelve months or more, her father married a second time, his wife being at the time a widow with three children. After the lapse of a short time, her relations with her stepmother becoming strained, she determined to leave home, and earn a livelihood for herself. Following the occupation of a seamstress, she became so expert and proficient in the use of the sewing machine as to be employed as an instructress at Cincinnati. She subsequently changed her residence to Chicago, where she received larger compensation for her services. Plaintiff states that she was reared in the Roman Catholic Church, and is devotedly attached to the faith of that church. In August, 1894, when plaintiff was about twenty-one years of age, she became a member of McDonald's Matrimonial Agency, of Chicago, with a view of forming an acquaintance suitable for marriage. She claims that she was advised to join this association by a prominent lady of Chicago whose daughters were members. Through this agency the plaintiff and defendant were placed in correspondence with each other, and exchanged photographs. The defendant at this time was a married man, but had begun proceedings for a divorce from his wife, which were still pending and undetermined. The defendant, it appears, opened the correspondence with

Kaufman *v.* Fye.

the plaintiff, her photograph having been first sent to him by the Chicago agency.

In his letter, dated at Tipton, Tenn., August 28, 1894, plaintiff represented himself "a bachelor, thirty-six years of age, fair, auburn hair, piercing blue eyes, American born of Scotch-Irish and high German parentage." That he was respected and considered wealthy. The letter continues, viz.: "Am not looking for wealth, but not objectionable. Claim to be all that any domestic lady is looking for. Live in country. Have some beautiful country houses in Tennessee and Kentucky; native of Kentucky. I am twenty-three miles from Memphis, and I think you would like this country, especially the mild winters and abundance of birds and flowers. Hoping to hear from you soon, etc., etc., I am your unknown friend,        W. P. KAUFMAN."

The defendant admits, in his testimony, that he began this correspondence for pastime, and not with a view of matrimony. In keeping with his real object, this letter is full of misrepresentation and deceit. On the other hand, the reply of plaintiff is characterized by the utmost candor, and there can be no doubt of her intention to form an honorable matrimonial alliance. Her reply was dated Chicago, September 13, 1894, and is as follows:

"DEAR FRIEND: Your welcome letter received. I am glad you like my picture. It is not very good of me. My friends say it is simply horrid. The

nose don't look like mine, and they say it looks so old, but I never take a good picture anyhow, so what is the difference? So you are wealthy; well, you have the advantage of me there. I am as 'poor as a church mouse.' I have to make my own living, and do so by teaching. I know how to sing and dance, sew and cook, etc. I am inclined to be jolly and good natured, and if you like blonds I am good looking. I am fair complexioned, five feet six inches in height, weight 137 pounds. I am a German and Catholic, and sing in a Catholic church. May I have your picture? I will return it upon request. Well, my friend, we are so far apart I am going to write you the truth just like it is. I consider it a waste of time to write a falsehood or misrepresent anything. I like candidness. I am twenty-one years old. My father lives in Cincinnati. He is in the newspaper business, and he got married when I was nineteen years old. I could stay with my stepmother, but don't like to. Please write and tell me more of yourself, and I will, in return, be frank with you in regard to anything.

"Your true friend,

"BIRDIE D. FYE."

In a subsequent letter her object is thus candidly expressed:

"What I want is this: An honorable, jolly, kind, industrious, sober gentleman, Catholic by faith. Now, you know I am a Catholic, and believe that my husband (if I ever shall have such an ornament),

ought to be the, same. So many are unhappy because of one being Catholic and the other some other denomination. It will create a discord. 'He' and I should harmonize in every particular.''

The defendant, however, continues the correspondence in his original strain. In a letter dated September 16, 1894, he says: ''I am a farmer and stave and lumber mill man, and recognized as the foremost of this country in these occupations. Have more than one country home; called nicest in this country. I have seen nicer, etc. . . . It is not special beauty I am looking for, neither is it wealth, as I can make all I need of the latter.''

In November, 1894, the defendant changed his residence from Tipton, Tenn., to Kingsland, Ark., where his milling plants were located. On November 11, 1894, after his removal to Arkansas, defendant extended the plaintiff an invitation to visit him at his home, which, after some further correspondence, was finally accepted by her. In this letter, he wrote the following, to wit: ''You should be very careful; never marry a stranger until you go to his lair, his home, or birthplace, and know who and what he is. . . . I contemplate going North during the winter, and, if you would allow me, I would be pleased to call on you, or, if I do not find time to leave, would suggest that you call on me, as I am always very busy, and you must know by experience that it is much safer for you to call on me than for me to call on you, as

you are then in position to know me and who I am, and this is the safe and proper way for correspondents to know each other. Have known several visits of this kind.'' In the same letter, in giving his ideal of a wife, he uses this language, to wit: ''But am not looking for a cook, as I hire that done, and would not expect to engage, as you might say, a lady in matrimony to cook and be a slave, but as an artistic and general housekeeper to know how to superintend cooking, and, when help could not be had, to prevent starvation. A purely domestic lady to feel and know and actually be a lady, and one who can cast everlasting sunshine on the man she loves and make home happy. . . . Kindly answer soon, and let me know your pleasure on my proposition, and your coming here some time in the future on a visit.''

Plaintiff replied to this letter, under date of November 15, 1894, in which she said, viz.:

''Your kind but somewhat plain letter received. You gave me quite a fatherly advice regarding getting married, going to his birthplace, etc. No, I am in no hurry, and also mean to be more careful. . . . If you should come here I would make great efforts to entertain you, so that when you went back you would not be sorry that you came. Nothing would delight me more than a journey to the South, etc. . . . My roommate thinks nothing wrong of my paying you a visit, but, dear friend, I am frank with you when I say I can't

afford it. It costs a woman too much to travel. I would want new clothes. One dress costs about twenty-five dollars. I would need, too, more than my traveling expenses, and odds and ends would come to about thirty or forty dollars.''

In his letter of November 21, 1894, he says, viz.:

''Oh no, there's no impropriety in your coming here, and I need some one to help me in various ways, and you write well and plainly, and could assist in correspondence and book work, as I will have to hire help later and store to look after, but your visit here, if you would only stay a few days, would perhaps not be as enjoyable as to stay longer; and, in due respect to you and myself, as a truthful and honorable man, I would say as to marrying, it's a very dangerous and serious matter, and one which all should think over before entering into such obligations, and while I must and am proud to say that a good woman is the greatest of all treasures, and I am only a man, comparatively, same as other men, I can't hardly rate myself with the average man, not that I am proud or smart, but others do that which I would not stoop to do. Such people in cities as are visited by some are never on my mind. Yet, I love the pretty girls who are worthy. Should you come here I would feel it an honorable obligation which I owe to myself and good raising to use every effort in my power to have you enjoy your visit.''

In her letter of December 2, 1894, plaintiff

writes, viz.: "When you wrote me in regard to my coming, I considered matters from all sides, and concluded that it would be a great pleasure. I considered, from your frankly written letters, that you would treat me as you would a sister. I have never been South, but am fond of Southerners, and would be delighted to see more of them, and live in their midst. So I concluded to come, and stay a few days, just so we could get acquainted. I will be your bookkeeper and do your writing if you will pay my expenses. My railroad ticket will be $20; sleeper, $2; meals, etc., $3; altogether, $25— one way. . . . There is to be no courting. I am to keep your accounts, do your writing, and work for you just the same as if I were working for a firm in Chicago. I would work for your interest. . . . I am independent natured, and can teach French, German, and, if necessary, I could be a governess or seamstress or cook or 'bottle-washer.' If you wanted me for company, I am ready to be with you and make you enjoy yourself. Horseback riding? Oh, my! I would rather do that than eat! I did that when I was a child in Germany; it is delightful. But since I am older, I could not have a chance in large cities. Yes, I am jolly, self-reliant, but careful and conscientious. Please write to me at once, and, if you want me to come, send me a ticket. I will start Tuesday evening, December 18, and reach Kingsland Thursday morning."

Defendant replied to this letter, December 7, 1894, in which he tells her to come, incloses $25 to defray her expenses, and promises to meet her at Pine Bluff, Ark. He further says: ''I will show you all the courtesy of a sister.'' In a former letter, defendant had written her, viz.: ''You are fast gaining ground. To be plain, it appears to me, a man who wouldn't love you, would be a wooden man.'' In' closing his last letter, of December 7, he says: ''You have an open field and the world at your command.''

In her letter of December 12, 1894, she writes that when she reaches the depot at Pine Bluff, Ark., for him to come up and say: ''How do you do, old girl?'' Defendant accordingly met plaintiff at the depot in Pine Bluff on her arrival, December 21, 1894, at 6:30 o'clock in the evening, and accompanied her to the Trulock Hotel.

It is admitted that, at the hotel, the defendant kissed her, despite a somewhat mild protest on her part. She asked him if he was not over thirty-six years of age, and he admitted, with some hesitation, that he was forty-four. She also inquired if he was married, which he admitted, but said his wife had not lived with him for thirteen years. He then advised her that divorce proceedings were pending, and he would soon be relieved of the matrimonial yoke. Plaintiff then replied that the question of a marriage between them was all over; that, under the rules of the Roman Catholic Church, she

was prohibited against marrying a divorced man.
Defendant then protested that he did not intend to
conceal the fact of his marriage from her, but could
not explain it so fully on paper, and expected to
disclose it to her at their first meeting. Plaintiff
repeated that, as a divorced man, the gulf between
them was impassable. Defendant insisted that plain-
tiff should keep her contract; that it would make
no difference; that she worked for other people, and
could work for him. Plaintiff then accompanied him
to his home at Knox, Ark., reaching there about
3 o'clock in the morning, where she was assigned
a room to herself.

Plaintiff remained at Knox, at defendant's home,
from December 21 to latter part of January, except-
ing a few days they spent together at Tipton, Tenn.
During this time she discharged the duties of book-
keeper and amanuensis with entire satisfaction to de-
fendant. Plaintiff, about January 25, 1895, went to
Memphis and secured employment as a sewing ma-
chine instructress. During her stay in Memphis de-
fendant continued to press his suit. Plaintiff, upon
the suggestion of a lady friend residing in Memphis,
who was also a member of the Catholic Church,
consulted the Rev. Father Hyacinthe, at St. Mary's,
in respect to the right of a member of that church
to marry a divorced person. The reverend father
informed her that the Catholic Church viewed the
institution of marriage as a sacrament, and that the
ordinances of the church against the marriage of

divorced persons applied to such only as had been baptized, and the defendant, Kaufman, never having been baptized, there was no obstacle in the way of plaintiff's marriage to him, especially if he would become a member of the church and submit to the ordinance of baptism.

Plaintiff communicated this information to the defendant, and, in his letters to her, he refers to it "as rolling a great stone from his heart." He further expressed an intention of becoming a member of the Catholic Church, and began the study of certain books pertaining to the Catholic religion, which the plaintiff had sent him. In his letter of March 30, 1895, he says, viz.: "As a matter of fact, I will surely be yours at such time as you may name, but suggest several months, in order to be in position to entertain you in a becoming way, and would regret to see you go to Chicago very much. . . . Don't worry at all about Kaufman. He will stand like a brick wall, and will verify any statement he will make. He is yours and you are his. Yes, in the plainest of English, he will be yours—lawfully (and otherwise)—and is now yours." In a letter of June 23, 1895, he writes: "If more convenient to you, you should have the right to fix the time for our partnership earlier than we had expected. . . . All I have said I fully mean, and have commenced with Father L. [alluding to his preparation to join the Catholic Church], and suppose that can soon be fixed, as neither of us are con-

tented, nor do I think we ever will be until we are partners.''

In July and August of that year (1895), at the request of Kaufman, Miss Fye made an extended visit to his home at Knox, Ark. Kaufman had promised that at the expiration of her visit he would accompany her to Cincinnati to become acquainted with her relatives. He accompanied her as far as Memphis, but claimed that business engagements would prevent his going to Cincinnati at that time, but he promised to follow her later and return with her to Memphis. The defendant, on. this trip, purchased a wedding dress for his intended bride, and also visited Father Larkin, at Memphis, to consult him about joining the Catholic Church. She had sent him a book entitled ''Catholic Belief,'' which he was studying. She stated that her agreement to marry him was not conditional upon his joining the Catholic Church, but she was anxious that he would do so, as in that event they could be married before the altar. The date of the wedding was now definitely fixed for the twenty-seventh of November, 1895. This date just preceded the last Sunday before Advent, during which time no marriages are celebrated in the Catholic Church.

It appears that for some cause the wedding was postponed, and in the latter part of December, 1895, defendant in error, at the request of Kaufman, visited him at his home in Tipton, Tenn., whither he had removed from Arkansas. She procured one

Mrs. Lucas, an elderly woman, to accompany her, on account of certain strictures made by the neighbors on the occasion of a former visit. Miss Fye remained at his house until February 8, 1896, when she left to accept some employment offered her at Little Rock, Ark. At this time plaintiff in error was suffering with a cold and a pain in his side. She suggested plasters, hickory bark tea, etc. He requested her to get the hickory bark, but, in the hurry of preparing for her departure for Little Rock, she forgot it until six o'clock that evening, when he asked for it, and on being told that she had forgotten it he became angry, and proceeded to get it himself. Defendant in error states that when she left he kissed her and gave no evidence of resentment or estrangement in his feelings toward her. She states that on her arrival at the depot in Memphis she bought a plaster and sent it to him. The defendant in error had been in Little Rock about one week, when she received the following letter, in which we find the denouement of this lawsuit:

"Tipton, Tenn., February 16, 1896.
"*Miss B. D. Fye, Little Rock, Ark.:*

" Dear Birdie: Yours thirteenth to hand, and I am glad your business is good. I received the mustard plaster, for which please accept thanks. I have with this forwarded your mail. My cold is better, but am yet very sore in the side from my hurt. Birdie, I feel very sad over our affairs, as it's very bad to learn to love each other as we have and

Kaufman *v.* Fye.

then find out that we are not suited. But I can never marry you. You fail to meet my requirements as a domestic helpmate and partner. I consider that I have discharged all my duty, and if you are deficient, I am not responsible for your shortcomings. You have my love, respect, and sympathy, and I shall forever hold you in memory as a true friend, but nothing more. With a sad and sympathetic heart, I am,

> "Truly your friend,
>
> "W. P. KAUFMAN."

On February 25, 1896, defendant in error replied to the above letter, viz.:

> "LITTLE ROCK, February 25, 1896.
>
> "*Mr. W. P. Kaufman, Tipton, Tenn.:*
>
> "MY STILL PRECIOUS SWEETHEART: I am sure you are mistaken in your last letter. Oh, it can't be true! Why, you say you can never marry me! Honestly, I have been sick; could hardly eat anything. I am hardly strong enough to write this now. I never thought you would have changed so suddenly. You kissed me on the morning I left. I have given you my word to be your wife, since we found out my religion would let me marry you. We have long since decided that we loved each other, and have been engaged positively since or before I left for Cincinnati. You know how many admirers I have had, but am still waiting for you. Tell me, kindly, the reason why you wish to break

your word.   We have told Mrs. Flynn, and you have even told Lizzie, the cook, that I was going to be your wife.   Do you think I would ever have gone back and forth to visit and cheer you up, if I had not been sure you were going to make me your wife?   The world, my intimate friends, father and everybody expects me to be Mrs. Kaufman.

"Candidly, dearest, tell me the reason of your sudden change. . . . Could it be that some one has said something against me?   I went away with a light heart from Tipton, thinking and telling the cook to be good to you, and I would soon come back and see you.   I bought a plaster for your sick side, and done everything that a woman's love could suggest.   Now, you owe me the reason why you so suddenly turned against me.   Do tell me the reason frankly!   You know how hard it is on a girl to imagine herself a happy wife and then the only one she loves—all her bright hopes for the future blanched like that.   You say you can never marry me.   Now, you did mean you never will marry me.   Tell me that, if you should mean that as your final words—as hard as they are, tell me them, if true. . . . Please do answer right away these questions—makes no difference if a short letter—and tell me the candid reason.   I shall rest easier now, and still imagine myself to be your soon future wife.   I never had any idea I would be otherwise than the future Mrs. K.   Was I mis-

15 P—11

taken? Write at once to your anxious, future, loving wife——                ´          BIRDIE.''

"206 Spring Street."

Plaintiff in error replied to this letter, under date of February 28, 1896, viz.:

"Yours of twenty-fifth to hand, full of childlike sympathy and loving - kindness. I wrote you last night and mailed this P.M., but did not give the explanation you ask for, but will now give it in all manner of candor and honesty. No, no one has told me anything to bring a change, and that would be hard to do, as I think I know you real well. But it is this, my dear girl. . . . You scold and fuss around and say mean things very unbecoming. Now, I may expect tenfold more if your authority was more; besides, my requirements are a little hard to fill as to a wife fully domesticated. I don't mean I expect you to cook, wash, and scrub—no, not that, but I do like to see a woman be business, attentive, prompt, diligent to such light duties as given. Birdie, you know at all times when I found that you had cooked, washed, and scrubbed I would tell you not to do that, it was not your duty, and too hard for you, but I did, at various times, give you other duties necessitating no exertion at all on your part, and, to my surprise, would nearly always find them neglected; and, if you will remember, I often told you talk was cheap, and I certainly thought your task was an easy one, and while I do not require much in a laborious

way, I do require one to be prompt and attentive, and the negligence you indicate, accompanied with a scolding disposition, is the sole cause of the change in my mind. . . . As to your virtue, I have no doubts — considered unquestionable — neither do I doubt your love, but it takes the other good qualities to make harmony. . . . I think it so very bad to have to live unpleasant, and it's better that we find out about each other before it's too late; and as a true, loving, and virtuous girl you have my love forever, but as a partner—domestic, prompt, and business—I regard you as a failure. If I needed a sewing machine woman or solicitor in city, you would fill the bill. . . . Yes, I received the plaster, but not the hickory bark until I got it myself. Birdie, you are a good girl when you are good, and you have sacrificed a good deal for me, for which I give you credit, but in accordance with my judgment I am still of the opinion that it would be best for both of us to remain friends, and nothing more. . . . Now, Birdie, cheer up, be stout and resolute, and say, let come what will, I'll stand the storm. I regret very much to have caused you the slightest grief, and, as to myself, I have no blame to cast on you. . . . I have highest respect for you, and would now and forever defend your good name,'' etc.

This letter ended the correspondence, and on the ———— day of March, 1896, the present action was commenced. It will be observed that the plaintiff

in error, in his letter explaining the cause of his breach of promise, assigns, as the only reason, incompatibility of temperament and her deficiencies in domestic accomplishments. In none of his letters do we find the slightest imputation in respect to her virtue, but, on the contrary, the most unqualified proof that he never suspected it. Yet, when the case was called for trial, by amended plea, he makes an attack upon her virtue, and specifically pleads that she had been guilty of lewd and unchaste conduct with one L. O. Knox, both before and after her engagement. Plaintiff in error also sought to show that she had been guilty of improper conduct with one Luke Lindsey, six or seven months after bringing her suit.

It must be admitted that the test to which the plaintiff's virtue was subjected during her courtship was a very severe one. She had been induced by the defendant to visit him at his mills in Arkansas, and to remain an inmate of his house, at different times, for a period running from four to six weeks. This very fact is now relied on by counsel for plaintiff in error as indicating that defendant in error was a woman of questionable virtue. Defendant in error admits that during this residence he attempted undue liberties with her, which she always resented, reminding him that he had promised to treat her as a sister. On one occasion he caught her by the ankle, when she struck him violently, and, to use his own language, "knocked fire out

Kaufman *v.* Fye.

of his eyes like electric car wheels.'' He after-
wards alluded in his letter to the time when he
sought to take advantage of her in his house, but
excused himself upon the ground that he had a right
to try her virtue; that he knows her now and loves
her better. In another letter, alluding to this in-
cident, he says: ''I don't blame you now, as a
lady, to call me down when I misbehaved. Yes,
you done right, for which I only love you more.''
Again he says: ''I know you better now, and will
do entirely different, and try to never intrude on
your sacred rights, and be contented with your lov-
ing-kindness. . . . Must acknowledge I never be-
haved so unbecoming,'' etc., etc.

It must be admitted that in this record are found
many incidents indicating great imprudence on the
part of Miss Fye, but, notwithstanding the ordeal
through which she passed, her virtue was impreg-
nable. The letters of the plaintiff himself furnish
the most ample proof of this fact.

The verdict of the jury is abundantly sustained
by the evidence, and the first assignment of error
must be overruled.

The second assignment of error is that the Court
erred in charging the special request submitted by
counsel for defendant in error, as follows, to wit:
'' If, in the opinion of the jury, the evidence shows
that defendant, under the guise of honorable propo-
sitions of marriage, or negotiations looking in that
direction, and, by false assurances, that there was

no impropriety in her doing so, induced the plaintiff to visit and lodge in his house for the purpose of furnishing himself an opportunity to debauch her, and thereafter, with the same motive, made with her a contract of marriage, which he then intended to violate, and did violate, all this may be considered by you in aggravation of damages; and, in such case, you may find for the plaintiff such damages as, in your sound discretion, from a fair consideration of all the evidence, you may deem proper.''

The criticism upon this charge is twofold: First, that there was no proof in the record that suggested such a motive on the part of the plaintiff in error; second, that it was error, as matter of law, to say that an unsuccessful attempt to seduce is to be considered by the jury in aggravation of damages.

It is not claimed in this case there was any actual seduction. On the contrary, both sides admit there was no seduction. It is well settled in this State that in an action for breach of marriage contract, seduction may be shown in aggravation of damages. *Goodall* v. *Thurman*, 1 Head, 216; *Williams* v. *Hollingsworth*, 6 Bax., 12.

But it will be observed that the precise question presented, in the instruction given by the Court to the jury, is whether the motive with which the plaintiff in error contracted this engagement and breached it can be inquired into, and whether the damages may be aggravated if it appear that the engage-

Kaufman *v.* Fye.

ment was formed merely as a cloak to accomplish the seduction of the defendant in error. Mr. Sutherland, in his work on damages, in treating the subject of breach of marriage promise, says, viz.: "The action for this cause is peculiar. While it is in form upon contract, and in truth based upon it and its breach, the damages are governed by principles which apply to actions for personal torts. The motives of the breach may be inquired into, and may be very material in respect to the amount of damages." Vol. 3, Sec. 983 (2d Ed.). Says the same author: "It is the policy of the law to encourage matrimony, and society has an interest in contracts of marriage both before and after they are consummated. A man who enters into such a contract with improper motives, and then ruthlessly and unjustifiably breaks it, does a wrong to the woman, and also, in a more remote sense, to society, and needs to be punished in the interests of society equally with the man who commits a tort under circumstances showing a bad heart. Accordingly, in an action for breach of promise of marriage, where it appears the contract was made and broken, exemplary damages may be given if the defendant was actuated by such motives and has been guilty of a ruthless and unjustifiable breach." 3 Sutherland on Damages, Sec. 987, citing *Johnson* v. *Travis*, 33 Minn., 231; *Kelley* v. *Highland*, 15 Ore., 277; *Chillis* v. *Chapman*, 125 N. Y., 214; *Howell* v. *Fuhrman*, 3 Ohio Circuit Court, 305; *Thorn* v. *Knapp*,

42 N. Y., 474; *Cargill* v. *Colbaugh*, 1 N. J. L.,
77; *Johnson* v. *Jenkins*, 24 N. Y., 252.

In *Thorn* v. *Knapp*, 42 N. Y., 474, Earl, C. J.,
said, viz.: "In such actions, it is not only proper
to show the main transaction, but any facts bearing
upon or relating to it, showing that it was done
wantonly, maliciously, and wickedly, with a view of
enhancing the damages." So in an action for breach
of promise of marriage, it is always competent, for
the purpose of enhancing the damages, to prove the
motive that actuated the defendant; that he entered
into the contract, and broke it, with bad motives
and a wicked heart, and it is competent for him
to prove, in mitigation of damages, that his motives
were not bad, and that his conduct was neither
cruel nor malicious."

The charge given by the Circuit Judge was in
entire accord with the authorities, and there was
evidence before the jury which fully warranted him
in giving it.

The third assignment of error is, that the Court
erred in refusing the following instruction, submitted
by counsel for plaintiff in error, to wit: "The
plaintiff, by her suit in this Court, necessarily ten-
ders an issue as to her character, and by her action
she declares herself suitable for a wife and mother
of a family, and I charge you, if you are satisfied
from the proof that she is not a woman of such
character and conduct as to make her a person suit-
able for a wife and mother of a family, she cannot

recover damages of the defendant unless you find, from the proof, the defendant knew of such acts and conduct as rendered her unsuitable for a wife and mother, and yet, such bad character and conduct, even if known to him, may be looked to in mitigation of damages for the breach of the promise." We think the Court, in its general charge, had substantially covered every proposition embodied in the foregoing instruction, and his refusal to repeat it in the language of counsel was altogether proper.

The fourth assignment of error is based upon the following instruction of the trial Court, to wit: "In this case the defendant has pleaded the unchaste conduct and want of virtue in the plaintiff as a defense to the suit. If the jury should believe, from the evidence, there has been a complete failure to prove the charge, this fact can be looked to to aggravate the damages."

It is insisted this instruction is erroneous in this, that in order for such a plea to aggravate the damages, it must appear from the proof that the plea was made in bad faith. We think the charge given on this subject by the trial Court was unexceptionable. It is true the limitation contended for by counsel for plaintiff in, error obtains in some of the States, but we think the sounder rule discards the qualification in respect of bad faith. "The rule is bottomed on the ground that the justification is placed on the record and will remain there as a continual reiteration of the charge against the plain-

tiff, and that therefore a trifling verdict would not show that such a charge was unfounded." 2 Sedg. on Dam., Sec. 640; *Kniffin* v. *McConnell*, 30 N. Y., 285; *Harris* v. *Doyle*, 27 Mo., 600; *Thorn* v. *Knapp*, 42 N. Y., 474. So in 2 Am. & Eng. Enc. L., 528, the rule is stated thus: "The fact that, to justify his refusal, he pleaded the plaintiff's unchastity in bar, whether such plea was in bad faith or not, is ground for aggravation of damages, though in some States, to enhance damages, the plea of justification must have been made in bad faith, and in some it cannot be taken into consideration at all." In the analogous actions for libel and malicious prosecution it is held, in this State, that a plea of justification, when the proof fails to sustain it, may be looked to in aggravation of the damages. *Williams* v. *Norwood*, 2 Yer., 329; 5 Yer., 211; 8 Hum., 34; 4 Cold., 29.

So in the recent case of *Ferguson* v. *Moore*, decided in Nashville, which was an action for breach of marriage contract, the trial Court had charged the jury that they might look to any indignities offered plaintiff during the trial, any imputations against her character, or impeaching her virtue, if any were made, and were untrue, as an element of damages. It was objected that this would not be so unless such charges and insinuations were wantonly and needlessly made. But this Court cited the case of *Williams* v. *Norwood*, 2 Yer., 329, as holding that, if such charges were proven true, they

Kaufman *v.* Fye.

would go in mitigation of damages, and, if untrue, they must be held to have been wantonly made.

The fifth assignment of error is that the Court failed and refused to give in charge to the jury special instruction No. 5. We think everything mentioned in this instruction was covered by the general charge, or special instruction No. 6,. which was charged in accordance with request of counsel for plaintiff in error.

There is no error in the record, and the judgment is affirmed.