## Scharringhaus v. Hazen.

(Decided June 25, 1937.)

426

SAWYER A. SMITH and JOHN J. JENNINGS, JR., for appellant.

STEPHENS L. BLAKELY and W. T. KENNERLY for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

In this action by Evelyn M. Hazen against Ralph P. Scharringhaus for breach of promise to marry the verdict was for $80,000, of which $65,000 is compensatory, and $15,000 exemplary damages. The review of the judgment has required the consideration of a very large record the trial having extended three weeks. In order to bring the opinion within fairly reasonable bounds, reference to much of the testimony relating to details and adding vivid color to the story of a shattered romance must be omitted.

The plaintiff was born November 8, 1899. After attending private school, she entered the University of Tennessee when not quite fifteen years of age, and there met the defendant who also was a freshman. He was three and a half years older. She was younger than her classmates, and apparently quite timid. Her college nickname was "Little Tim." She was chosen as the prettiest or most popular girl on the campus, and as the sponsor for the Cadet Corps was given the honorary title of Colonel. She was first attracted to Scharringhaus because of his kindliness and because he did not tease her as did so many of the boys. He shielded her and took her part. Their courtship began in 1916. She looked upon him at the time as a "big brother" as well as a sweetheart, and her confidence in him progressively grew. He belonged to the same fraternity as her cousin; was serious-minded and interested in his church, of which she too was a member. She respected him for his character and ideals. During this college romance they saw much of each other and daily notes were left at the campus book store for one another. In the spring of 1917, they became engaged to marry. He gave her his officially registered fraternity pin, which he told her would stand for an engagement ring. He testified she refused to accept it on that basis because she was wearing the pin of another boy, and

agreed only to keep it for him until his return from the army. She produced the pin on the trial. During this period, she testified, from time to time Ralph commented upon her innocence, and in a gentlemanly way told her he thought a girl of her age ought to know more about matters of sex. She had been sheltered at home and was wholly ignorant of such things. Then as an older brother or sister might have done to a child, he gave her ideas which she grasped and delicately explained the relations of the sexes, with the illustration of the pollination of flowers, and spoke of those relations as something sacred. Thereafter from time to time, with no purpose, as she is yet assured, other than for her protection and without any intention to be offensive, he spoke of these things. He told her he wanted her always to be innocent of those matters and not to learn of them from any one else.

The time came during the summer of 1917 when he entered the officers' training camp at Fort Oglethorpe, which was not far from Knoxville. He came home nearly every week-end. On one of those visits in October, 1917, when she was not quite eighteen years old, while they were out riding, he suggested that they should be married then and she should go back with him to the encampment. They stopped at the court-house to obtain a marriage license, but the bureau was closed. It was agreed they would be married the next day, but that morning he called to say he had to take his mother somewhere. Being Saturday, they found the marriage license bureau closed again that afternoon. That evening at her home he made most ardent love and spoke of how he hated to go back to the camp without her and probably that he would not be able to obtain another leave of absence before going to France. She was madly in love with him. He insisted that if she loved him as she said she did, she would yield to his desires. She resisted and reminded him of the advice he had given her, and he responded that it hurt him very much that she would not believe him. He insisted they would be married in the eyes of God, and that the only difference would be that the ceremony which they would later have would permit her to come to him openly at the encampment. Because of these and other importunities, she yielded herself to him. After that, she testified, the matter of marriage seemed to be settled so far as he was concerned. He always said they were

married in the sight of God. She remained in college and he was transferred to another military camp in South Carolina. The defendant admitted the engagement and that they had gone one night to obtain a marriage license. However, he fixed the time as being in 1918. He testified that she had treated the matter as a joke and had refused to entertain seriously the idea of an immediate marriage. He denied the circumstances, place, and time of the intimacy described by plaintiff. Particularizing, he denied having said anything about their being married in the eyes of God then or at any time. He testified that through their kissing and petting they had drifted into the relation without any reference to marriage and that she had yielded herself voluntarily. But, this, he said, was in 1920. It is observed that this date put her age within the age of consent. He had given her an engagement ring in 1920.

The plaintiff testified to her great distress over what had occurred and its repetition when he would come back to Knoxville. He would ''fall back on the religious and sacred aspect'' and reprove her for not feeling the same way, that is, as regarding herself as being married. The defendant denied all of that. But his denials are contradicted by his own writings. Daily letters passed between the parties, and a great many of his letters written during this period proclaimed an ardent love, expressed his loneliness and pictured the prospects of an early marriage and the beauty of a home with her. Thus in January, 1918, he wrote: ''I love you very much, Evelyn, which is natural since I am going to marry you.'' In March, 1919, he wrote: ''I guess it is well we didn't get married because I don't believe you would live down here with me.'' The plaintiff testified to having torn up some of his letters, which he had asked should be done. But several of those retained contain cryptic statements which, in the light of the developments, are easily decipherable and highly significant. These confirm the plaintiff as to the existing situation, and especially her distress.

After getting out of the army in the spring of 1919, Scharringhaus resumed his studies at the University and completed his course. He then went into business with his father, who was a wholesale dealer and manufacturer of clothing. For a time he earned $400 a month, but insisted that he could not afford the respon-

sibility of supporting a family. Miss Hazen had graduated in 1918 and begun teaching in the Knoxville High School in the following November. This, she testified, played into his hands, for the rules of the school board barred married women from the staff. She did not like teaching and was always ready to give up her place. In the alternative, she pleaded with the defendant for a secret marriage. Finally he allowed her to fix a wedding day in the fall of 1924. He postponed the wedding until spring because he did not think his parents would be pleased, but felt he could satisfy them in the meantime. Another day was definitely set in March, 1925, and Miss Hazen chose her bridesmaids, began accumulating her trousseau, and made other plans. Some of the defendant's letters about this time indicate the prospective marriage. Indeed, Scharringhaus did not deny the fixing of the dates for the marriage, but insisted on the witness stand that it was not he but the plaintiff who had postponed the wedding, which was over his violent objections. As the time approached and she spoke of the coming wedding, he became evasive. He wrote her a letter referring to his embarrassment over not having said anything "the other night" and added, "I just really cannot take the responsibility of a home now. I don't want you to feel badly. You know I am going to."

During these several years after his return from the army, the parties went together everywhere. Their friends chided them for not getting married, and, according to Miss Hazen's testimony, Scharringhaus would make no response but leave her always to bear the burden of defense or excuse. When he would be away from home on business or vacation, his ardent love letters came with almost daily regularity. These also affirmed plaintiff as to her anxiety. His letters from 1924 to 1929 had been destroyed, but there are many later letters of like character and import. Nowhere is there any record of a suggestion that she was refusing to marry him, as he testified she was continually doing.

When asked her reason for having continued the relations, she answered:

"I didn't have any choice, I felt, I knew well from his importunities and from things he said from time to time that if I refused often enough,

and I did refuse as often as I dared, that he would not marrry me; that he didn't think I loved him, * * * Based on these statements, that if I didn't allow him to do as he wanted, that I would prove to him that I didn't love him and didn't want to marry him. Perhaps I was wrong. I didn't know anything else to do and I believed, of course, we would be married, it was always just a little way in the future, never any great distance in the future, I thought going on was the lesser of two evils. * * * I believed he would go off and find someone else, I believe now he would, I know now he would, I know now that he did."

For a long time during the development of the situation, the defendant was apparently religious. He had attended church regularly with his parents, and become a member of the Board of Deacons. His version of this was that he was elected deacon in his absence; that he made no claims to piety; and that he accepted the place to avoid disturbance. Later, according to the plaintiff, he began to drink heavily and gamble excessively. This he denied. In July, 1929, he had written her while she was in New York on a visit indicating an intention not to marry her. That letter was among those destroyed. But he had retained her answer, which was put in the record. It expresses extreme shock and disappointment. After her return to Knoxville, there was a reconciliation, although, according to Miss Hazen, he was adamant until she stated she must tell her father of the situation. From time to time during the later periods this threat of disclosure to her father had caused him to renew his assurances and kept him from discarding her. The defendant testified that by 1929 she had so chilled his love that their relations had become impersonal. However, he was confronted with letters more amorous and passionate than those of an earlier date.

She was imploring him all along for at least a secret marriage and offered to maintain him out of her salary. On May 28, 1932, there was a very friendly evening together. There appeared to be a return of his love, for he assured her of his purpose to marry as soon as he was financially able. During the several days following they had telephone communications and, finally, in a rage, he charged her with spreading gossip about him. He refused to see her and when she went

to his home one evening while he was there, she was met at the door by his father who insulted her within the hearing of the defendant, and he raised no protest. On June 1st he wrote indicating a complete break and laid the entire responsibility upon the plaintiff. At this time her father was lying at the point of death in a hospital. He died three days later.

Following this, Miss Hazen turned to two or three intimate friends and her first cousin, T. F. Hazen, and disclosed her distress to them. He was a close friend of Scharringhaus and talked with him about the matter in Knoxville. Scharringhaus contradicts Hazen as to the material statements in these conversations. However, he agreed to meet Hazen and the plaintiff in New York, where she had gone at the instance of her cousin. On July 4th the three met at a hotel there. According to T. F. Hazen and the plaintiff, the conference was begun with the preface by Hazen that she should tell her story and if she made any mistake and the defendant desired to correct her or make an explanation as she went along he would do so. According to Scharringhaus, that was not true. She rehearsed the history of their relations from the beginning and made some ugly accusations of a desire upon his part to indulge in perversion. From time to time during this recital Hazen asked the defendant whether those statements were true or not and he said nothing. She demanded a definite answer whether he would marry her and he said, "It isn't possible." Hazen testified that she stated to him she would agree to go through a ceremony, keeping the wedding secret, or announcing it; to live with him or not to live with him; to do anything he wanted to do, just so he would give her the satisfaction of knowing that she was married so she could have some peace of mind. Mr. Hazen insisted that it was his duty to marry her and that the family was not willing for her to be disgraced and for him to go back to Knoxville and continue to be respected. She threatened him with criminal prosecution or suit for damages. He finally acceded to Hazen's suggestion that he give the matter further consideration, and stated he would return to Knoxville to confer with his father and let him know the result. The following week he would not see the plaintiff, and in a telephone conversation refused to discuss the matter any further.

After this, according to the evidence, there was

a decided change in her general physical and mental condition. From a gay, pleasant, and cheerful disposition, she became depressed and morbid, restless, and nervous.

Because of the publicity given the matter, Miss Hazen was discharged as a teacher in the high school, when her salary was $2,400 a year, less a temporary cut of 15 per cent. She had not been able to secure other employment until December, 1933, when she obtained a clerical place paying $15 a week.

Miss Hazen filed a suit for damages for breach of promise to marry against the defendant in Knoxville, but no service was obtained upon him. He was then in Florida and came from there to Erlanger, Ky. This suit was instituted in May, 1933. The defendant's verified answer was introduced in evidence. In it he denied that there was any promise to marry or any seduction by him, and charged that plaintiff "was guilty of lewd and lascivious conduct such as showed her to be unchaste and unfit for his wife"; and further that she had repeatedly threatened to kill him. During the opening statement by defendant's counsel, he stated to the jury that the defendant would prove she "had" several men and named four to which the evidence was later directed. In anticipation, the plaintiff described in detail her friendly associations with these men, which was with the knowledge of the defendant and without objection upon his part at the time. She vehemently denied there were ever any improper relations with them or any one else than the defendant. The depositions of two of those men whom only the evidence for the defendant indicated she had been intimate with were also read in chief, and they, sustained the plaintiff in every particular.

A number of citizens from Knoxville testified to the fine reputation and high social standing of the plaintiff. Being goaded by the cross-examination, the witnesses proclaimed their confidence in her character and integrity, notwithstanding the disclosures of her relations with the defendant. Among these witnesses was the superintendent of the Knoxville High School who had asked for her resignation on this account.

As we have indicated, the defense was a denial of most of the material testimony of the plaintiff, and presented a claim that always it was she who had

avoided marriage. To many of these things reference has already been made. The defendant testified that she had dominated and mistreated him and made him miserable by her nagging, but the circumstances he related appear trivial. She had refused to be married because she did not like his German name and insisted that he change it; she could not get the kind of trousseau she wanted; she disliked domestic life; she did not want any "damn brats." He denied having seduced her under promise of marriage, and in effect charged that in May, 1932, just before the final breach she had overcome his powers of resistance and seduced him. With the execption of one other, the defendant contradicted all of the witnesses by saying that the plaintiff was profane. Her associations with the four other men were over his objection and had been very embarrassing to him. She had finally destroyed his love and he felt under no obligations to marry her.

If it were his word against hers, the conflict in evidence might create some doubt as to the true story, but his letters, as we have stated, support plaintiff's version throughout. Thus he admits that in all his letters he had never made any complaint or reference to her ·receiving the friendly attentions of those with whom he was now ·charging her with having improper relations.

The defendant testified that at the last the plaintiff had threatened to kill him, had cursed him, called him a cad and a skunk, and applied epithets to him. The profanity and threats she denied. We appraise these outbursts, if they be true, as those of a woman driven to desperation by the cruel and ruthless treatment.

Accusations were made that early in their courtship Miss Hazen had been very friendly with a young man by the name of Lindsay, which it is said proves inconsistency. This seems to have proved the defendant's jealousy and established nothing more. After Miss Hazen had begun teaching in the high school, she had, he testified, likewise embarrassed him by associating with an overgrown boy to whom she was giving private instruction that he might pass his examinations. In 1923 when plaintiff was doing some special newspaper reporting and associating with an assistant editor of the newspaper, he was displeased. The evidence does not afford a suspicion of evil or disloyalty. These incidents oc-·

curred long ago and even then seemed to have caused no substantial protest. An effort was made to charge the plaintiff with improper relations with Carl Stafford, who was a mutual friend of all the parties. He was employed in New York and saw Miss Hazen there during her visits in the summer. On one occasion they were members of a party at a summer resort near Knoxville. The effort to prove impropriety and illicit intimacy with this man failed. The only testimony of substantial facts from which her guilt could be inferred was that of Miss Gertrude Eager, to whom we shall presently refer. The jury was authorized to accept the denial by the plaintiff and Stafford.

While in New York in 1929, Miss Hazen met a young man by the name of McKnight. He paid her some attention, taking her to the theater and sometimes to dinner. But usually her host and others accompained them. Early in 1930 McKnight wrote Miss Hazen asking her plans for the summer, and she advised him she was going to Europe by way of Cleveland, Buffalo, and Montreal. He was a traveling salesman at that time and expected to be in that territory and asked for an engagement in Cleveland and permission to drive her to Buffalo. McKnight met her at the railroad station and took her to the hotel, where her father had previously made a reservation. McKnight was also stopping there. The next morning they drove to Buffalo. On her return from Europe McKnight also saw her in New York and came to Knoxville in November to confer with a banker relative to a position in that city.

All of these friendship and associations were known by the defendant both before and after they occurred and he made not objection. He charges that after the breach between them he learned that the plaintiff had occupied the same room with McKnight in Cleveland. That information came through Miss Hazen's former friend, Miss Gertrude Eager. She proved to be his principal witness. Miss Eager was also a teacher in the high shcool and about ten years older than Miss Hazen. After the defendant had discarded her and her father died, Miss Hazen turned to her friend for advice and told her the entire story. She was outraged and offered the best advice, consolation, and encouragement she could. She declared, ''Evelyn, you are a fool if you don't kill this man.'' The confidences continued and Miss Eager undertook to bring about a reconciliation.

She had always been friendly with Scharringhaus and his family and invoked the influence of his aunt. She sat in at Miss Hazen's consultations with her attorney. She wrote to Carl Stafford, a mutual friend, who was then in New York, asking him to write Evelyn to come there because of the developments in Knoxville, and even suggested that he should ask her to marry him. This is the same man with whom she testified Miss Hazen had been intimate. He wrote her to come but did not suggest marriage. Very plaintively she wrote Miss Eager, "This letter haunts me, Mildred. The ghastliness of his finality. He was glad I was left so defenseless. Mildred, I can't stand this torment much longer." She added, "For God's sake, help me, Mildred."

When she returned from New York the last of July, she telephoned Miss Eager and accused her of having double-crossed her, saying that some one had made the story public. Miss Eager left town the next day. At a teachers' meeting early in September, this friendship was definitely broken. She also lost her place as a teacher. Miss Eager voluntarily came to Kentucky to testify for the defense. Among other confidences betrayed, she related in minute detail and by direct quotation of a repeated conversation what the plaintiff had told her some time before about having spent the night at the hotel with McKnight, who had registered them as husband and wife under his name. Also, they had taken a week-end trip together to Buffalo. She turned over an intimate letter from Miss Hazen, which, it may be said, the latter insisted had been mutilated. She disclosed to the defendant the consultations of the plaintiff with her attorneys. The witness was presented in an ugly attitude. She had drunk from the same cup and then betrayed her friend. The impeachment is self-evident.

Miss Marion Fellows, an intimate friend of Miss Eager, came from Philadelphia and testified that Miss Hazen and Miss Eager together had visited her in July, 1931. After an acquaintance of only eight days, Miss Hazen unbosomed herself and told her about having stayed with McKnight. Her testimony is in almost the identical language that Miss Eager had used. Her evidence is incredible.

Miss Gertrude Penland, the sister of one of the

defendant's most intimate friends and a fraternity brother, testified to conversations with the plaintiff in which she expressed her affection for McKnight. She had once told her she had gone to Cleveland to be married to him, that they could not secure a license that evening, and had spent the night together registered as "Mr. and Mrs. J. F. McKnight." A cloud of suspicious bias rests upon the witness. The same is true as to her brother, whose evidence, however, is much less incriminatory.

It is not shown that any effort was made to obtain or prove the hotel register, which, if the accusation was true, would have corroborated the testimony. It may well be added that on account of the frailty of human nature admissions testified to by a witness are entitled to but little weight. Even where there is neither motive nor desire to prevaricate, it is difficult to repeat tomorrow statements made today in the language in which they were made even when they were perfectly understood. Becker v. Crow, 70 Ky. (7 Bush) 198. The issue of the plaintiff's unchastity with others than the defendant was presented to the jury as a bar to her right to recover anything, if true [see Barrett v. Vander-Muelen, 264 Ky. 441, 94 S. W. (2d) 983], and they rejected the evidence.

There is much other evidence relative to the activities and relations of the parties during the fifteen years' engagement. Some of it reflected on the plaintiff and tended to weaken her claims of an undivided loyalty to the defendant and his full responsibility for their not marrying. Likewise there is other evidence tending further to place the defendant in a bad light. If we have emphasized the plaintiff's evidence, it is because the jury accepted it and by it the issues made on the appeal must be decided. It is apparent that the verdict is not flagrantly against the evidence as the appellant submits.

The question is raised about the sufficiency of the pleading of the law of Tennessee, where the contract was made and alleged to have been breached, and which law was relied upon by the plaintiff. Whatever defects there may have been in the pleading were cured by the stipulation of the parties as to what that law is. Lindsey v. Home Ins. Co., 244 Ky. 580, 51 S. W. (2d) 924; Swiss Oil Corp. v. Hupp, 253 Ky. 552, 69 S. W. (2d) 1037.

The stipuations are that under the common law of Tennessee a cause of action for breach of promise to marry may be maintained where both parties are unmarried, and in such a suit a woman "may allege and prove in aggravation of damages for breach of such contract that while said contract of marriage existed the defendant seduced her." See Goodall v. Thurman, 1 Head (38 Tenn.) 209; Spellings v. Parks, 104 Tenn. 351, 58 S. W. 126. Therefore, the instruction authorizing the jury if they believed from the evidence that the defendant seduced the plaintiff under promise of marriage and persuaded her by reason of such promise thereafter to submit to other acts of intercourse with him, they could in their discretion in addition to compensatory damages award the plaintiff punitive damages. The first portion of this instruction stating the measure of compensatory damages is criticized. It is as follows:

"The court instructs the jury that if you find for plaintiff, you will award her such a sum as you may believe from the evidence will fairly compensate her for defendant's failure to marry her, and any mortification of feeling or mental suffering, if any, on account of such failure, if any there was, and any loss of money, if any she suffered on account of such failure."

The form is taken from Hobson's Instructions to Juries, sec. 114, which is based upon Grubbs v. Pence, 73 S. W. 785, 24 Ky. Law Rep. 2183, approving an instruction in that langauge. It is argued that the instruction to award such sum as "will fairly compensate her for defendant's failure to mary her" furnished no guide for measurement. Perhaps it would have been better to have imparted more clearly the idea that the elements connected to that phrase by the conjunction were those to be regarded in fixing that compensation for the failure to marry, but we are sure the jury was not misled by the form of the instruction.

The plaintiff was a very voluble witness, and it was difficult for the court to control her expressions and descriptions. The result was that a number of conclusions and extraneous statements got into the record. We have considered those to which our atention has been specifically directed, and while most of them were incompetent, by no means can they be regarded prejudicial to the defendant's substantial rights.

The only real question there is in the case is whether the verdict must be regarded so excessive as to require a reversal of the judgment rendered thereon. To be excessive in the ordinary case, the damages awarded must be such as to strike the mind of the court at first blush as having been superinduced by passion or prejudice or as having been estimated upon an erroneous measure. Welch v. Jenkins, 190 Ky. 475, 227 S. W. 798.

An action for breach of promise to marry in respect to the question of damages has never been limited by the rules governing actions on simple contracts for the payment of money. It is really in the nature of an action for tort. The damages recoverable are not limited to the consequences of the breach.

The rule as to elements to be considered is thus comprehensively stated in 9 C. J. 372:

> "In estimating damages it is proper to consider anxiety of mind produced by the breach: loss of time and expenses incurred in preparation for the marriage; advantages which might have accrued to plaintiff from the marriage; the loss of a permanent home and advantageous establishment; plaintiff's loss of employment in consequence of the engagement or loss of health in consequence of the breach; the length of the engagement; the depth of plaintiff's devotion to defendant; defendant's conduct and treatment of plaintiff in his whole intercourse with her; injury to plaintiff's reputation or future prospects of marriage; plaintiff's loss of other opportunities of mariage by reason of her engagement to defendant; plaintiff's lack of independent means; her altered social condition in relation to her home and family, due to defendant's conduct; and the fact that she was living unhappily at the time of the alleged promise."

See, also, Grubbs v. Pence, supra; 4 R. C. D. 155; Keezer, Mar & Div. secs. 41, 52; Sutherland on Damages, secs. 986 et sep.; Brown v. Odill, 104 Tenn. 250, 56 S. W. 840, 52 L. R. A. 660, 78 Am. St. Rep. 914; Hively v. Golnick, 123 Minn. 498, 144 N. W. 213, 49 L. R. A. (N. S.) 757, Ann. Cas. 1915A. 295.

In this case we have shown that under the Tennessee law the court properly instructed the jury that they might consider the fact of the plaintiff's seduction

as an aggravation of damages for breach of the contract and award punitive damages therefor. That is the law in most jurisdictions. Keener, sec. 45; Sutherland on Damages, sec. 984.

It has been repeatedly held that the nature of the case is such that the amount of compensation cannot be fixed by any precise rule and the question of the justice or adequacy of the verdict rests peculiarly in the discretion of the jury. 9 C. J. 382; R . C. L. 155; Keener, Marriage & Divorce, secs. 41, 49; Gerlinger v. Frank, 74 Or. 517, 145 P. 1069.

The Tennessee Supreme Court in the Goodall Case, supra, thus pertinently spoke:

"A promise to marry is not unfrequently one of the base and wicked tricks of the wily seducer to accomplish his purposes, by overcoming that resistance which female virtue makes to his unholy designs. Whenever seduction follows an engagement to marry, it may well be asserted that the promise, on the part of the man, was intended to cover his designs upon her virtue, by winning her affections and confidence. The fact that the hypocritical suitor is prepared to destroy her character, shows, conclusively, that it was not his intention to make her his wife. His success in the destruction of his victim, is, generally, the result or consequence of his engagement to marry. This injury, then, is sufficiently proximate to be taken into the account in estimating the damages in a suit of this description."

The Michigan Supreme Court, in the breach of promise case of Bennett v. Beam, 42 Mich. 346, 4 N. W. 8, 11, 36 Am. Rep. 442, declared:

"Damages which the jury may give on account of the seduction rests almost wholly with them, the court but seldom interfering, because supposed to be excessive. That the act of seduction, under a promise of marriage, should go a great ways with a jury in estimating the damages, ought to be true, both in law and fact. In many cases loss sustained from a breach of the agreement to marry may be slight indeed; but never can this be the case where the life-long blight which seduction entails enters into the case. Respectable society inflicts upon the unfortunate female a severe punishment for her too confiding indiscretion, and which the marriage

would largely, if not wholly, have relieved her from. The fact of seduction should therefore go a great ways in fixing the damages, as in no other way could amends be made the plaintiff for the injury she sustained, or the defendant be properly punished for his aggravated offenses. It would seem also to be in full accord with the sense of justice implanted in the heart of every right, high-minded person, and therefore with the reason of the common law.''

It may be added that, while the financial condition of the defendant and his social standing are proper facts for the consideration of the jury in estimating the damages to be awarded, since they bear directly on the actual detriment the plaintiff has sustained by his failure to perform his marriage contract, the wealth or poverty of the defendant or his ability or inability to pay is not a criterion. It is what the plaintiff ought to recover. ''It is enough that they [damages] cannot be collected when recovered,'' observed the court in Goodall v. Thurman, supra, in which it was held that this was a proper subject upon which to charge the jury. See, also, Baker v. Bates, 4 Higgins (4 Tenn. Civ. App.) 175, 178; 9 C. J. 372; 4 R. C. L. 159.

No mercenary motive leaps from the record or lurks in the background as is so often the case in suits of this character. There is displayed the picture of a young woman of refinement, culture, and high social standing. There is unfolded the story of grievous wrong with tragic consequences, of lost employment, of a vanished profession, of intense mortification, of wounded pride, of a broken spirit, of wrecked hopes, of despoiled honor, of degraded reputation, of lost social standing. She has been robbed of the priceless jewel of chastity and branded with a mark as indelible as the mark of Cain. The doors of real love and matrimony have doubtless been closed against her. If she is to be believed, the defendant possessed this girl, body and soul, during the charm of youth and until the blossomed maturity of womanhood. For fifteen years he played with the tender chords of a woman's heart and when he became tired crushed them as he would an inanimate thing. If she is to be believed, she was true and loyal in her plighted troth and then when her natural protector lay dying, she was cruelly discarded. If she is to be believed, as a Pecksniff, the defendant

casuistically uttered moral precepts and pretended to virtue and while thus garbed in the cloak of religion, he obtained her confidence and betrayed this girl of seventeen years.

Bulwer-Lytton truly wrote:

"Of all the agonies in life that which is most poignant and harrowing—that which for the time annihilates reason and leaves our whole organization one lacerated, mangled heart—is the conviction that we have been deceived where we placed all the trust of love."

He who perhaps drank deeper from the fountain of human nature and who therefore better understood the weakness of man thus poured forth in immortal lines the value of a good name as compared with money:

"Good name in man and woman, dear my Lord,
Is the immediate jewel of their souls.
Who steals my purse steals trash; 'tis something—
    nothing;
'Twas mine, 'tis his, and has been slave to thou-
    sands;
But he who filches from me my good name robs
    me of that which not enriches him and makes me
    poor indeed."

If this verdict be the result of inflamed passion and prejudice, it was ignited and fanned by the appellant himself. The record speaks for itself. Broyhill v. Norton, — Mo. —, 74 S. W. 1024. While it does not appear that always an instruction covering it should be given, any indignity or mistreatment after the breach of the contract, including what occurs during the trial of the case, are proper subjects for consideration in the matter of aggravation. Keezer, Marriage & Divorce, sec. 46; 57 C. J. 41; 4 R. C. L. 160 2 Sedwick on Damages, sec. 640; 2 Am. & Eng. Enc. of L. 528; Hively v. Golnick, 123 Minn. 408, 144 N. W. 213, 49 L. R. A. (N. S.) 757, Ann. Cas. 1915A. 295. Thus, where, as here, there was an unsustained attack upon the plaintiff's moral character, it was held in Williams v. Norwood, 2 Yerg. (10 Tenn.) 329, 336, that it was the duty of the trial court to charge the jury if they believed the evidence had been wantonly made because wholly untrue, that fact should be considered in aggravation of the damages. The rule is based on the ground that the record will remain as a continued reiteration of

the charge against the plaintiff and therefore a trifling verdict would not show that such a charge was unfounded. See, also, Ferguson v. Moore, 98 Tenn. 342, 348, 39 S. W. 341; Kaufman v. Fye, 99 Tenn. 145, 160, 42 S. W. 25; Heggie v. Hayes, 141 Tenn. 219, 227, 208 S. W. 605, 3 A. L. R. 150.

In O'Brien v. Manning, 101 Misc. 123, 166 N. Y. S. 760, 762, a breach of promise case without the element of seduction, the court said:

"The charges against the plaintiff made by the defendant in his answer were untrue, and were known by him to be untrue at the time. As he admitted on the stand they were put in the answer 'to protect' himself against the claim made by the plaintiff. Such a step was unjustified; it was even inexcusable. It was vicious, and showed an utter disregard of the plaintiff's rights and feelings. It merited punishment, and so an award of exemplary damages."

In that case the verdict was for $225,000, of which $100,000 was ordered remitted.

Here the defendant had sworn in his answer that there was never any promise to marry the plaintiff and that she had been guilty of such lewd and lascivious conduct as proved her unfit to be a wife. He admitted the former to be untrue and failed to prove the latter to the satisfaction of the jury. Likewise, in the opening statement to the jury charges were made which were never proven.

The verdict is indeed large, but it is not as large as others which have been sustained. See O'Brien v. Manning, supra; Cleavenger v. Castle, 255 Mich. 66, 237 N. W. 542, which was for $215,000. It must be remembered that in addition to those intangible injuries to which we have referred, the plaintiff has suffered physically and mentally and sustained large actual pecuniary damages in the loss of her position as a teacher at a salary of $2,400 a year. A jury of the home county of the defendant and his father's family have placed the amount of $80,000 as being the sum to which the "stranger within their gates" is entitled. We are not prepared to say that it is so excessive as to require a reversal of the judgment.

Judgment affirmed.

Whole court sitting.