## Miller v. Commonwealth.

(Decided Oct. 29, 1937.)

COOPER & COOPER for appellant.

HUBERT MEREDITH, Attorney General, and **J. M. CAMPBELL,** Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— 'Affirming.

Appellant seeks the reversal of a judgment imposing upon him one year's imprisonment for the seduction of a female under 21 years of age under a promise of marriage.

Both the accused, then 22 years of age, and his victim, then 18, were reared and lived in Calloway county. They were both poor. Both had been reared on a farm, neither had enjoyed any but limited school and other social advantages, hence neither had that culture, refinement, or social restraint and control that such opportunities would have given them and were, as appellant's

counsel say in their brief, "Young people with ideals regrettably and unfortunately low."

That unfortunate social condition does not put them below the cognizance or protection of the law. Indeed, it is, for the poor, the lowly, and the helpless, that governments and courts have been set up and laws have been written. The great and mighty have little need for these. They would perhaps be greater and mightier without them, than with them, but the poor and lowly would be utterly wretched without them. The more helpless you are the higher you stand in the favor of the courts.

The county of Ballard is largely devoted to the culture of strawberries, and in the harvesting of these berries vast numbers of men, women and children are required. Hence, when the strawberry season comes, there is a great influx from surrounding counties of men, women, and children who come seeking employment as strawberry pickers.

Both the accused and his victim came to Ballard county for that purpose, but did not come in the same party. They had never met before, and each was utterly ignorant of even the existence of the other and the tragic part each was to play in the life of the other. The accused came first, and on Monday, May 14, 1934, his victim and a number of other young women came. They met that day by chance on the roadside. Miss McCuiston and others of her party obtained employment on the farm of Mr. Hardin Gholson, and the party, of about 20 girls, encamped on his farm. The next evening, May 15th, the accused and some other young men came over to the camp to visit the girls. He came back every evening and each evening, except May 21st (when she was sick) he and Miss McCuiston were together, their last evening together being May 25th.

### Betrothal and Betrayal.

On Friday, May 18th, the evening of his fourth visit, the accused and his victim walked over to Byassee's store, which was about a half mile from this camp, and as they walked home in the gloaming he spoke to her about marriage. This is copied from her evidence.

"Q. Young lady, when did he first say anything to you about marrying you? A. I had been with him about four times, I guess.

"Q. What was the first thing he said to you about marrying you? A. He first asked me if I had a sweetheart, asked me if I ever had been with any boys and if I had, would they care for him going with me, and he just asked me if he could have intercourse with me.

"Q. He was asking you about marrying him? A. He said, he would marry me if I would have intercourse with him.

"Q. When did he first ask you? A. About on Friday night.

"Q. Where were you then? A. On our way from the store to the place where we stayed.

"Q. What did he say to you? A. He said, if he did have intercourse with me that he would marry me. He asked me, if I would, and I said no, and he asked me again, and he said, 'if you will, I will marry you.' I told him not to come back anymore when we got home, and he said he was coming back.

"Q. What happened on Saturday night, was there anything said about marrying? A. Yes.

"Q. Did you tell him not to come back again? A. Yes, I told him if he was going to talk that way for him not to come back, but he come back Monday and I was sick. * * *

"Q. During the time you were going with John Tom Miller, did he seduce you? A. Yes sir.

"Q. During the time you were keeping company with John Tom, did you have intercourse with him? Yes sir.

"Q. At the time you had intercourse and prior to that time, when he would ask you to submit, did he say anything about marrying you? A. Yes.

"Q. Tell the jury what he said. A. He said, he didn't want to go with a girl that run around and that he wanted to have intercourse before he went any further.

"Q. What did he mean by that? A. I don't know about that, but he said, he would marry me if anything happened and if nothing didn't happen, we would marry if I wanted to.

"Q. How many times did he make you that promise? A. I couldn't say, several times.

"Q. Did you have intercourse with him relying on these promises? A. Yes sir.

"Q. How many times did you have intercourse with him? A. Twice.

"Q. I believe you say this intercourse occurred on Thursday, the first time. A. Yes sir.

"Q. What did he say to you, if anything, about anything happening to you? A. He said, 'if anything happens, we will marry.'

"Q. Was that the night you had intercourse with him? A. Yes, I said, 'you will not marry me if nothing don't happen,' and he said, 'yes,' and I asked him when, and he said, 'when you get ready.'

"Q. Did you tell him that you would marry him? A. Yes, that night.

"Q. At the time this defendant was keeping company with you down here in this County, did you know that he was married? A. No sir, he told me the last night, as he was going, he came back and told me.

"Q. He had not told you nor you had not had information that he was a married man until after this seduction? A. I hadn't heard a word about him being married.

"Q. After you had intercourse with him on these two occasions, what became of him? A. He went back to Murray.

"Q. Then you returned where—back to Murray? A. Yes sir.

"Q. After you returned did you have any conversation with him about marrying you? A. Yes sir.

"Q. What did he say at that time? A. Said that he would marry me.

"Q. Did he marry you? A. No sir.

"Q. How many conversations have you had with him since this situation about marrying you? A. Every time he was with me, he come down to my home eight times and I talked to him three or four times at Murray."

The difference between the account given by his

victim and that given by the defendant is summed up in this which is copied from his cross examination.

"This girl told the truth except the promises you made her about marriage? A. And the amount of times we had intercourse."

The defendant stoutly denies all promises or even mention of marriage, testifies he only visited her three times, and says he had intercourse with this girl three times, and that the first time was on the occasion of his second visit on the evening of Wednesday, May 16, 1934, as they walked home from Byassee's store. The evidence is overwhelming that he visited her every night.

### The Verdict and the Evidence.

One of the grounds urged for reversal is that Miss McCuiston's account of what occurred between them, devoid as it is of any expressions of love by either for the other, is so unbelievable that the case should not have been submitted to the jury, and the verdict returned by the jury is flagrantly against the evidence. This account is in rather striking contrast to that detailed in Scharringhaus v. Hazen, 269 Ky. 425, 107 S. W. (2d) 329, which for delicacy of approach, persistence of pursuit, and finality of accomplishment is unsurpassed, but we must not lose sight of the difference in the social and cultural status of Miss Hazen and that of the victim in this case. The account given by Miss McCuiston is rather crude, but a grand jury of 12 men did believe it, and a petit jury of 12 other men also believed it, and the latter jury had these parties before them, observed their conduct, noted their appearance and demeanor while testifying, and heard their testimony, and we are unable to say this evidence does not support the verdict or that the court erred in overruling the defendant's motion for a directed acquittal made at the close of the evidence for the Commonwealth and renewed at the close of all the evidence.

### Refusal of Continuance.

The defendant sought a continuance, but he was not taken unawares, he had 11 meetings and conversations with his victim in 1934, after her seduction, he procured her in early part of 1935 to sign the paper set out later, he was indicted September 2, 1935. Cause was, on January 7, 1936, continued to April term on

motion of defendant's counsel, because of absence of three witnesses. At April term he did not appear, his bond was forfeited and summons awarded for his sureties. He claims to have arranged with his victim to pay her $100 and she would not appear against him. At 5 p. m. August 23, 1936, $100 was tendered his victim which she declined to accept. At 8 p. m. that day he employed his present counsel. What became of his former counsel, Mr. Ben B. Morris, does not appear. When this case was called at 8:30 p. m. August 24, 1936, defendant filed affidavits of himself and his present counsel and moved to continue the case because his present counsel had not had time to become familiar with the case and because of the absence of the same three witnesses as in January. The court overruled his motion. This is relied on as error. As to the arrangement he claimed to have had with his victim, if she had accepted the money, that would have been compounding a felony. Such contracts are illegal and utterly void. See American National Bank v. Madison, 144 Ky. 152, 137 S. W. 1076, 38 L. R. A. (N. S.) 597; First National Bank v. Payne, 42 S. W. 736, 19 Ky. Law Rep. 839; Barclay v. Breckinridge, 4 Metc. (61 Ky.) 374.

The defendant will not be heard to say he failed to prepare his defense to this offense because of his expectation of committing another offense, and of inducing his victim to fail to appear, which would obviate the necessity of preparing and employing counsel for the preparing for defense of this one.

Suppose he had said he had hired a man to kill Elena McCuiston and fully expected him to do so, but at the last moment his hired assassin had backed out on him, and therefore he was not ready and had not employed counsel, etc., the court would not have listened to him one moment. Yet that is simply stating in a little stronger terms exactly what he states in his affidavit. Of course a few days for investigation and preparation would have been of great help to Messrs. Cooper and Cooper, but they were not accused of any crime, they are evidently attorneys of learning and experience, for they made most efficient use of the time they had.

The defendant was at large on bond, and was charged with a crime alleged to have been committed 28 months before he was put upon trial, which was ample time for preparation. He had had one previous

continuance, and the law frowns upon, repeated continuances. No reasonable ground is shown for not employing counsel sooner than he did, and his application was properly overruled. See Moody v. Com., 43 S. W. 209, 19 Ky. Law Rep. 1198; Carpenter v. Com., 92 S. W. 552, 29 Ky. Law Rep. 107; Sizemore v. Com., 108 S. W. 254, 32 Ky. Law Rep. 1154; 16 C. J. p. 483, sec. 875.

## The Indictment.

The defendant demurred to the indictment and also filed a motion to set it aside, both of which were overruled, and this he contends was error. We shall first copy the indictment, inserting in parentheses the words of whose omission he now complains:

"The Grand Jurors of the County of Ballard, in the name and by the authority of the Commonwealth of Kentucky, accuse John Tom Miller of the Crime of Seduction under the promise of marriage, committed in manner and form as follows, to-wit: The said John Tom Miller in the said County of Ballard, 2nd day of September, 1935, and (within 4 years) before the finding of this indictment, did unlawfully, willfully and feloniously seduce and have carnal knowledge of Elena McCuiston (a female) under the promise of marriage, who at the time was under the age of 21 years, against the peace and dignity of the Commonwealth of Kentucky.

"———————————,
"Commonwealth's Attorney, 1st Judicial District."

Upon this paper the following indorsement appears:

"A true bill—F. H. Owen, Foreman of the Grand Jury. Presented by the Foreman of the Grand Jury to the Court in the presence of the Grand Jury and received from the Court by me and filed in open Court. 9-2-1935. Emily B. Weaks, Clerk."

The failure of the Commonwealth's attorney to sign this indictment does not affect its validity. Com. v. Stepp, 193 Ky. 469, 236 S. W. 1049; 31 C. J. p. 619 sec. 114. We have no law requiring that an indictment be signed by the Commonwealth's attorney. It is the action of the grand jury in finding and returning it, into

and in open court as "a true bill," and the filing of it as a part of the records of the court, that give it validity. 31 C. J. p. 589, sec. 57. Were that not true, a very awkward stiuation would arise if the grand jury should find it proper to indict. the Commonwealth's attorney for some offense committed by him.

The defendant contends the omission of the words "within four years" vitiated this indictment, but we have heretofore decided that identical question against him in Com. v. Dickerson, 258 Ky. 446, 80 S. W. (2d) 540.

We come now to the omission of the words "a female" after the name of Elena McCuiston in this indictment, which the defendant insists made this indictment fatally defective because the language of the statute (section 1214) is "seduce and have carnal knowledge of any female," and this indictment merely names Elena McCuiston and does not allege she is a female. Her name indicates she is a female, the defendant, perhaps better than any one else, knows she is a female, and the later birth of a child from her demonstrates she is a female, so the defendant with all this knowledge could not have been misled by the omission of the words "a female" in this indictment.

A similar omission was made in State v. Olson, 108 Iowa 667, 77 N. W. 332, 333, and in its opinion affirming a conviction the Supreme Court of Iowa said:

"The law has never recognized that the crime of seduction can be committed by any other than male persons, nor upon any other than female persons. 'In applying the statute, the connection in which words are used is not to be disregarded.' * * *

" 'The indictment is sufficient if it can be understood therefrom * * * that the act or omission charged as the offense is stated in ordinary and concise language, with such certainty and in such a manner as to enable a person of common understanding to know. what is intended, and the court to pronounce judgment according to law upon a conviction.' Code sec. 5289."

A similarity of that language to section 122 of the Kentucky Code in criminal cases of Practice in criminal cases renders further comment unnecessary. See, also,

Battle v. State, 4 Tex. App. 595, 30 Am. Rep. 169, and Taylor v. Com., 20 Grat. (61 Va.) 825.

This indictment does not charge that at the time of this seduction the accused and his victim were both unmarried, but this is a question we disposed of adversely to defendant's contention over 40 years ago. See Davis v. Com., 98 Ky. 708, 34 S. W. 699, 17 Ky. Law Rep. 1265. See, also, Com. v. Tobin, 140 Ky. 261, 130 S. W. 1116.

## The Baby.

This is copied from the bill of exceptions:

"The jury had been sworn, and just as counsel began his statement, the prosecutrix took her seat at the counsel table, holding in her lap a young child, less than two years of age. Counsel for plaintiff pointed to the witness while she had the child in her arms while he was making his statement to the jury. The defense objects to the presence of said child in the lap of prosecutrix, or in the presence of the jury, and the defense moves that the swearing of the jury be set aside and the jury dismissed. The court overruled same to which ruling the defendant objects and excepts.

"Counsel for plaintiff in making his statement to the jury, made the statement, that the prosecuting witness, Elena McCuiston as a result of the relation with the defendant, John Tom Miller, conceived and bore child at which time, attorney for defendant objects to same, and enters motion that the swearing of the jury be set aside and the jury dismissed. The above statement was made while the prosecutrix was seated at the counsel table with a little child less than two years old in her arms.

"The Court: Gentlemen: I hope you will observe this admonition: As has been stated to you, this is a charge of seduction and the statement of the attorney that this prosecuting witness bore a child is irrelevant in a case of this kind. Please don't consider that, gentlemen.

The prosecutrix Elena McCuiston being called to the witness stand by counsel for plaintiff with the child in her arms and was testifying as a witness while the child was in her arms is objected to by attorney for defendant.

`"The Court: Gentlemen, exclude from your minds that this baby is in this case and that the witness took the child with her while testifying, don't consider that."

During the course of the trial, while Mrs. Allie Hodges, the chaperone of this party, was testifying, this occurred:

"Q. When was the first time that you knew this young lady had been seduced? (Objections.)

"Court: Let it stand. (Exceptions.)

"A. You mean the condition she was in?

"Q. When was the first time you remember of hearing about the condition of this girl? A. Well, I didn't know anything about it until the next Fall.

"Mr. Cooper: Judge, we don't consider that competent testimony and move to exclude. (Overruled. Exceptions.)

"Court: The witness used the language, 'The shape she was in,' you will exclude that." (It will be observed the language used by the witness is, "The condition she was in," whereas the court's language is, "The shape she was in.")

While Russ McCuiston, the father of the prosecuting witness, was testifying, this occurred:

"Q. He admitted to you that he had had intercourse with your daughter and wanted to make arrangements about it? A. Yes sir.

"Mr. Cooper: We are objecting seriously to this, Judge.

"Court: Don't go any further."

The defendant has seized upon these two scraps of evidence and the above-cited occurrences in the statement of the case by the Commonwealth's attorney, and, at the time Miss McCuiston was called to the witness chair, and planting himself upon the case of Jordan v. Com., 180 Ky. 379, 202 S. W. 896, 898, 1 A. L. R. 617, and cases following it, is arguing most strenuously that the mere bringing of this child into the courtroom, in the presence of this jury, constituted an incurable reversible error.

There is some similarity between the Jordan Case and this one. Both are seduction cases prosecuted under

section 1214, Ky. Stats. In both cases the defendant admits the illicit intercourse, but denies it was obtained under a promise of marriage, and in each case the same punishment was inflicted. Let us examine this Jordan opinion to see just what it permits, just what it forbids, and just why that judgment was reversed, and with those purposes in view we shall quote from that opinion:

"We do not, however, rule that if a child is born as the result of the alleged seduction, the prosecuting witness may not have with her, in the courtroom in the presence of the jury, the child, although its presence unexplained or uncommented on might create, in the mind of the jurors, an unfavorable sentiment against the accused. But the probability that the appearance of the child might create such a feeling is not, we think, sufficient to justify us in holding that the mother may not have it with her in the courtroom."

From this we see it was not error for this unfortunate young woman to have her child with her in the courtroom. This is in harmony with the following which is copied from Underhill on Criminal Evidence (3d Ed.) sec. 797:

"No principle of law ought to be permitted to operate to prevent the mother from having her infant child with her in the court room during the trial. The maternal instinct, and perhaps, necessity both may prompt her to have the child with her; and, if such is the case, it may be very difficult to prevent the members of the jury from making an inspection of the child; and a comparison of its features with those of the accused, though their attention is not expressly called to the matter."

In 40 A. L. R. 144, the annotator writes:

"While there are loose statements to be found in some cases which seem to indicate that the writers of the opinion regarded the mere presence of a child in court, when its paternity was in issue, as prejudicial (see for example, Eckhart v. Peterson (1917) 94 Wash. 379, 162 P. 551; but compare State v. Carter (1894) 8 Wash. 272, 36 P. 29), the courts with one accord hold that, unless the child is shown to the jury to excite the prejudice of the jury against its alleged father, it should not be excluded

from the court room or from its mother's arms while she is testifying; at least, provided no 'informal exhibit' is thereby made of it, as by reference of counsel to its appearance,'' etc.

To sustain his text the annotator cites 42 cases from 19 American jurisdictions. This annotation is supplemented and other cases cited in 95 A. L. R. 317.

As soon as the defendant sees this he will perhaps say the very thing that the cited annotation says shall not be done happened in this case for the prosecuting attorney was allowed to refer to the child, etc. He is mistaken, for, while the attorney started to do that, the moment the defendant objected, the court stopped the attorney and admonished the jury. We affirmed a bastardy case, James v. Com., 190 Ky. 458, 227 S. W. 562, where the child was in the courtroom.

The judgment in Alderson v. Com., 218 Ky. 591, 291 S. W. 1012 (a statutory rape case), was reversed for another reason, and for the guidance of the trial court we directed that upon the next trial the child should not be in the courtroom.

We are not going to narrow in any way the permission granted in the Jordan opinion for the baby to be allowed in the courtroom, and are not going to follow this Alderson Case here, as our rules as to cases of statutory rape are not entirely in harmony with our rules in seduction cases, for we do not allow the resulting pregnancy to be shown in seduction cases but do permit it in cases of statutory rape. See, Druin v. Com. (Ky.) 124 S. W. 856; Gilbert v. Com., 204 Ky. 505, 264 S. W. 1095; Kayes v. Com., 221 Ky. 474, 298 S. W. 1096; Bethel v. Com., 231 Ky. 541, 21 S. W. (2d) 830.

This difference in our rules has provoked some criticism, see 14 Ky. Law Journal 127, and 17 Ky. Law Journal 265, and in some foreign opinions, and it may later become necessary to harmonize them, but we will not attempt that now.

To enable us to understand just what happened in that Jordan Case we will quote again from that opinion:

"Hon. John W. Waugh (in his speech to the jury turning and taking the baby from its mother, to which the defendant objected, the court overruled the objection, and the defendant excepted): Look here, gentlemen of the jury; look here. The

most innocent thing that God ever created; look at this little head, the very imprint of its father; could he deny it? He doesn't. What effect is this going to have upon this innocent babe? It will be turned into the world without a name; this makes no impression on him; he doesn't care; this innocent babe and the mother who must always go through life with the finger of scorn pointed at her; think of this little child when she is old enough to go to school and she is grown up; you know what they will say; a bastard; a child without a name; and there sits its father, unconcerned, its father, he don't deny it, and refuses to lift a finger to rectify the wrong he has done. He makes no attempt to save his own; he says he did not promise to marry her. (The defendant entered a motion to exclude the above from the jury; the court overruled the motion, to which the defendant excepted.)"

There is a vast difference between that and what was said and done here. This further quotation from the Jordan opinion shows why that judgment was reversed:

"We have reversed more than one case because of improper argument of the attorney for the commonwealth, when the argument was not based on incompetent evidence, and when such an argument as was made in this case finds its support in incompetent evidence, and is accompanied by the acts described in the record, we do not feel disposed to pass it by as harmless error."

From a consideration of all the foregoing we conclude there was no prejudicial error in what this record shows was said and done relative to this child. The child was not offered in evidence, was not formally shown to the jury, its name was not mentioned, the date of its birth was not given, and the record does not disclose whether it is a boy or a girl.

### Did Prosecutrix Know Defendant Was Married?

One of the defenses relied on by the accused is that he then was a married man, hence was in no position to enter into an engagement to marry, and here is his testimony as to what he claims he told his victim when he first met her:

"Q. Tell the jury what happened on that occa-

sion between herself and the group of girls and yourself with reference to each other. A. She (Miss McCuiston) asked how many of the boys were married and I said, 'I am the only one married.' "

Defendant introduced Jeff Albritton of Murray, Ky., and this is copied from his testimony:

"Q. Were you in his company when he first met, or came in contact, with Miss Elena McCuiston? A. Yes.

"Q. State whether or not, anything was said about any of you being married men, or anything to that effect in sum or substance. A. John Tom said, 'I am the only one married.'

"Q. Tell the jury how he come to make that statement, if you know? A. She asked if any of us was married, and John Tom said, 'I am the only one that is married.'

"Q. That was said in the presence of Elena McCuiston? A. Yes sir.

"Q. When these girls got down there to where you were parked by the field, what did they say? Did they ask if any of you were married? A. No.

"Q. What did they say? A. One word brought on another. I don't remember all of it.

"Q. How long did you talk to them? A. About thirty minutes.

"Q. All you can remember is, that when these girls asked if anybody was married, John Tom said he was? A. Yes.

"Q. Did somebody in the crowd say, 'are you fellows married,' or something to that effect? A. Yes.

"Q. Who said that? A. I couldn't say.

"Q. Was it Elena McCuiston? A. I don't know."

Miss McCuiston testifies that did not occur, and Miss Halloween Marr (a cousin of Miss McCuiston), who was present at that time, testified no such thing was said, and both of them testify Jeff Albritton was not there. The Commonwealth then called J. I. Fox, the deputy sheriff who had subpœnaed Albritton, and this is copied from his testimony:

"Q. State whether or not, you in the presence of Mr. McCuiston had a conversation with Jeff Albritton about coming over here and testifying in this case, and whether or not, he told you that he did not know anything about the case and that he was not over here and heard John Tom Miller say he was a married man? A. Yes.

"Q. Tell the jury what the conversation was. A. I called him in the Sheriff's office and told him the attorneys had an affidavit for him to swear to and I read it to him, he said 'I don't know anything about it'; I said, 'I have a subpœna and you will have to go.'"

Just what was then said and which of these witnesses told the truth was for the jury to find from the evidence, and, unfortunately for defendant, the jury did not believe this occurred. The defendant himself apparently did not believe this, for he does not deny the testimony of his victim that on the occasion of his leaving after his last visit this occurred:

"He left and came back and said, 'what would you say if I told you I were a married man.' I said, 'where is your wife,' and he said, she was in Paducah.

"Q. Was that the last night you had intercourse? A. Yes, that was the last night.

"Q. He told you the last night you had intercourse with him that he was married? A. Yes."

There was no need of this if he had told her before. The accused has been married twice. He first married Miss Idelle Hebron of Paducah in 1932 and on May 9, 1935, he married again, but the name of his second wife is not given in this record.

### Reputations.

Good previous reputations were proven for both Miss McCuiston and the defendant, but the effect of the testimony of his witnesses is affected by these questions and answers copied from their testimony:

"Q. Do you recall the time he was arrested and had to marry the girl in McCracken County? A. I heard it.

"Q. You did not hear about the time he was ar-

rested in McCracken County and made to marry this girl? A. Yes.''

The truth of these rumors was not established, but the Commonwealth had the right to ask about them. See Wright v. Com., 267 Ky. 441, 102 S. W. (2d) 376, headnote 9.

### The Paper Admitted.

''I, Elena McCuiston of her own free will makes this voluntary and true statement relative to the sexual relation between herself and John T. Miller. I, state, and said statement is true, that I did have sexual intercourse with John Tom Miller in Ballard County, Ky., several times in the months of May, 1934; that after we had had intercourse several times John Tom Miller stated to me that he was in love with me and promised that he would marry me as soon as he got a divorce from his wife, and said he would take the proper steps to get a divorce. I state that as yet he has not gotten a divorce and that I am about to become a mother as a result of the sexual intercourse. This Jan. 7, 1935.

''[Signed] Elena McCuiston.''

Here is her account of the signing of this paper:

''Q. Tell the jury why you signed it? A. Him and another man came down there and said, they were fixing to have me in court, or put me in court, and he said he come down there to tell me that he would get a divorce and pay all the Doctor bills and that was all in this paper, but I was so nervous I couldn't read it. He said, 'I am going to take it to my wife and show her I am wanting a divorce.' I said, 'do you think that will have anything to do with it,' and he said, 'I brought it down for you to sign and I can get my divorce quicker and marry you quicker'; I didn't read it; I asked him what was in it, and he said he was telling her he wanted a divorce.

''Q. You say you signed it without reading it? A. Yes sir.

''Q. And you signed it because he promised you he would do what? A. He wanted to show it to his wife and he could get a divorce sooner and marry me.

''Q. Everything in there is true, is it not? A.

No, it is not true, I didn't say it was true, you asked me if I signed it and I said yes.

"Q. You signed it, that is true? A. Yes." Here is what the defendant testifies about it:

"Q. I hand you a type written paper to which is signed the name of Elena McCuiston. * * * I will ask you if that is the same paper you carried to her? A. Yes.

"Q. And the same one that was signed by her? A. Yes.

"Q. Before she signed it, tell the jury what you said to her and what she said or did. A. I asked her if she would sign it; she said, 'what is it,' and I said Hall Hood asked me to have you sign it; she says 'you read it,' and I read it to her and she signed it."

We are unable to attach any great importance to this paper. Suppose everything in it is true and that it was correctly read to her, there is nothing in it that is in conflict with her testimony that John Tom Miller promised to marry her before he wrought her her ruin, that she did not then know he was a married man, and that she yielded her person to him because of his promise to marry her. In his brief on this appeal it is argued there is no evidence she promised to marry him, but in this the testimony of the prosecutrix cited above, where she says she promised to marry him, has been overlooked.

### The Argument.

Exceptions were taken to some remarks in the closing argument of the county attorney, but, since the record does not disclose just what was the ruling of the court thereon, we must presume he ruled correctly.

Judgment affirmed.

The whole court sitting.